May it please the Court. My name is Tim Cronin, appearing on behalf of the Plaintiff Appellants in this case. As the Court is no doubt aware, this is a product liability case under the LPLA involving the explosive separation of a multi-piece wheel, resulting in a brain injury, fractured face, and shoulder injury to the plaintiff. I'd like to focus my time on two issues if it appeals — if it pleases the Court. Understanding one of the issues in our appeal is a JNLV for against the manifest weight of the evidence, I don't think it's a good use of the Court's time for me to recite six days of testimony on that issue, so I'll rest on my briefing and the record. The first issue I'd like to focus on is that several elements of plaintiff's claim under the LPLA should not have been submitted to the jury for consideration as they had been admitted by the defendant's corporate representative and should not have been reasonably disputed were not reasonably disputed, specifically that there was an alternative product design capable of preventing plaintiff's injuries. Also, the plaintiff's damages arose from a reasonably anticipated use and that plaintiffs suffered actual damages from a characteristic of the product. The second main issue is that we believe it was error to admit a highly prejudicial drug screen by Mr. Hebert from long after he sustained his injuries from this incident for which there was no proper foundation and no relevance for any issue for the jury to decide. So on submitting elements of a plaintiff's claim to the jury for which there's no reasonable dispute, if — I think everybody would accept that if the plaintiff makes an admission that's detrimental to their case and can no longer reasonably dispute that they can't prove an element of their case, the plaintiff's case should be thrown out on summary judgment or a directed verdict should be granted. We're simply saying the same should apply from the other perspective. If the defendant, by their one witness that speaks on behalf of them, admits elements of a case, that element should no longer go to the jury to decide it as a question of fact because it is not a question of fact. Under the LPLA, one of the elements plaintiff must prove is that an alternative design for a design claim, that an alternative design existed for the product that was capable of preventing plaintiff's case. What about this reasonably anticipated use piece of that? Well, I think reasonably anticipated use is a different element than alternative design, but that is another one of our arguments, that that is a different element that shouldn't have gone to the jury. And, Your Honor, on that question, there was one eyewitness other than the plaintiff who actually had the thing blow up in his face that saw what happened. His name is also Mr. Averill, although they're not related. And he says, we put the thing together right, the locking ring was in, we put it up, we're airing it up, it blew up in his face. Wasn't there some evidence presented of the physical evidence that suggested he did not use it as reasonably anticipated? I mean, again, if there's some evidence, then it goes to the jury, even if, you know, ten witnesses say the light was red, but one says it was green, it goes to the jury, even if the guy that says it was green is sweating and shifty-eyed. It still goes to the jury. I agree, Judge. I don't think there was credible evidence to say the locking ring wasn't in, because even the eye – all of the eyewitnesses who were there, anybody, even if they didn't see it, if they heard it, said they heard a boom like a cannon went off. And their corporate reps said if the locking ring isn't in, that sound would not have happened. But assuming there was evidence to say that they could defend saying the locking ring wasn't in, their corporate reps still admitted that wasn't a reasonably anticipated use. And it's an objective question of whether the manufacturer, that manufacturer, should reasonably anticipate this kind of use. I don't know — Are there differences between reasonable anticipation and foreseeability, or are they the same thing? I think there can be a difference. And luckily, the corporate rep in this case admitted both things verbatim. And he admitted it was foreseeable and reasonably anticipated by Titan that a multi-piece wheel could be improperly assembled, including by not putting a piece like the locking ring in. Can you give me the record site you're reading from? I'm sorry, Judge, it's in my brief. I don't have it in here. I can grab it from my brief. All right. I cited directly to that in my brief. No, I know, but you're reading me something. I'd like to know what you're reading from, but it's your notes. I just have my notes, Judge. Okay. That's fine. I'm sorry. I think I cited to that specific testimony several times in my brief. It is from Mr. Kuhl's testimony, both when I put him on the stand in the plaintiff's case and then again when I crossed him in the defendant's case. And I said, was it foreseeable that this thing could be aired up with the locking ring not fully seated? And then I said, by foreseeable, I'm asking you, was it reasonably anticipated by Titan that this could happen and it would explosively separate? And he said yes. And then I asked the same question for improper assembly without the locking ring. Was that foreseeable? Yes. And by foreseeable, I'm asking you, was it reasonably anticipated by Titan? That's the ultimate question. And the defendant admitted they knew it could happen. I don't know what other evidence. I think it's Record Document 208, pages 188 and 189. Thank you. Thank you, Scott. Not only did Titan admit they could or should have foreseen this use, but that they did, in fact, foresee it and reasonably anticipate it, regardless of whether the locking ring was off or not properly seated. They admitted under either circumstance it can explosively separate. And, Judge, they had to admit that because they know it's happened hundreds and hundreds of times. This is not some novel product liability case. There have been dozens and dozens of these cases around the country. There were government investigations into exactly this, where there's 400 to 500 documented incidents of explosive separations blowing people's limbs off and their heads off in NHTSA, Department of Transportation, government investigations. All of that was presented to the jury. Titan knew all of that before they made this wheel in 1988. It's the reason that the wheel industry stopped making these wheels for highway use around the 80s. But the Department of Transportation doesn't have jurisdiction over agricultural use, so they kept making them for agricultural use. But Titan knew this was blowing people's heads off. This is a 75 to 80-year known problem. As to the alternative design issue, there is no question that a single-piece wheel existed. Firestone was the predecessor to defendant Titan with respect to this wheel. Firestone sold its wheel division to Titan. It's the same design. Firestone issued a patent in the 1950s stating that single-piece wheels would, quote, Titan's corporate reps specifically admitted they had a single-piece wheel that would have accommodated this application back in 86 or 87, before the subject wheel was, which is before the subject wheel was manufactured, that a single-piece wheel would eliminate the likelihood of an explosive separation. This is obvious because how a multi-piece wheel works is it's several pieces of metal that intricately fit together that are then only held together by the extreme pressure of airing up the tire. A single piece cannot explosively separate because it's a single piece. Titan admitted if it had decided to use a single-piece wheel instead of a multi-piece wheel, that subject single-piece wheel would not have explosively separated. And the question, Titan argues extensively in its brief and did at trial, that there can be dangers with single-piece wheels, so they're not safer than multi-piece wheels, because you can still overinflate the tires. Well, that's not what happened here. That's not what caused plaintiff's injuries. Or the — I'll go ahead. Mr. Cronin? Yes. Everything you're telling us is more than the jury heard. Is that right? I mean, about this — Everything I'm telling you are things the jury heard. I agree, Judge. All right. So there's no complaint that there was something that they should have heard in terms of what you're telling me right now that they didn't get to hear? No, Judge. Hearing all that, they ruled against you? I agree, Judge. I'm a little confused about how they did it. I know jury deliberations are sacrosanct. I can't know how they reached their decision. But I'm saying when admissions are made by a defendant, then the jury should not be asked to decide a question of fact when it's been established that the defendant has admitted they can't dispute them anymore. And they should only decide the remaining disputed issues to alleviate the potential for some kind of error in deciding a fact wrong that's been — But you're saying there was an objection to a jury charge or a jury instruction being given along those lines, and the judge overruled that objection? I made a motion for a directed verdict on these specific elements that I'm saying should not have been submitted to the jury. And I think during the jury instruction conference, I preserved that objection, that those should not have been submitted to the jury. About very specific instructions, you made objections. Is that what you're saying? To the verdict director, I believe I did. I know I made a motion for a directed verdict on it and argued to the Court and preserved it, I believe, at the jury instruction conference. These elements just should not have been on the verdict director. Okay. Let me ask you back to the issue of Multi versus Single. I understand Multi might cause this accident. Yeah. But Single might cause something else. Why wouldn't that be part of the analysis? The fact that Single wouldn't have caused this exact accident doesn't make Single the better design if it could cause some other accident. Well, I think the evidence showed, Your Honor, that a Single can't really cause other types of accidents other than overinflating the tire, which can also happen with a multi-piece wheel, but the more direct response. The problem, you know, the problem as I see it is that there is some evidence of the fact that Single's not necessarily a perfect alternative or a reasonable alternative. The fact that there is a lot more evidence that it is, to me, doesn't answer the question for really where Judge Graves was heading with his questioning, which is it's not like summary judgment was granted. This would be an easy case if summary judgment had been granted. But this went to a jury. I understand, Judge. And you're kind of saying you couldn't have lost. On these, well, I think on all the elements, the evidence is overwhelming. On these specific elements, we shouldn't have had the opportunity to lose on them and to directly answer the question about whether there are things that can happen with single-piece wheels. The language for alternative design under the LPLA is not whether some other danger can happen. It is whether the alternative design was capable of preventing plaintiff's damage. And plaintiff would not have sustained this injury because an explosive separation would not have happened with a single-piece wheel. So saying other things can happen with single-piece wheels is legally irrelevant. The question is whether it would have been capable of preventing plaintiff's damages. Their corporate rep admitted an explosive separation would not and cannot happen with a single-piece wheel. There was no beating issue. There was no overinflation issue. There was no damaged rim issue, which is, I think, the things they're saying that can also happen with a single piece, but that's not what happened. There wasn't a beating problem. There wasn't an overinflation problem. There wasn't damage to the rim. And our expert explained, yeah, there can be failures with single-piece wheels because of a beating problem. That was resolved by the late 80s when this one was made. That isn't actually an issue anymore. What do you agree the jury should have been asked besides damages? Well, Judge, again, preserving my argument on the manifest weight, I think what I'm asking for outside of the illegal drug screen, which I haven't addressed yet, that I don't think should have come in. I think the jury could have been asked the risk-utility test for unreasonably dangerous. And so that's what I'm asking for the prejudicial evidence of the drug screen, which I haven't talked about yet, but which is briefed, to be excluded. And for these elements, either one or all three of them, that I think were conclusively established and admitted, not to go back down and those elements not be submitted to the jury. And we can just submit on the risk-utility test, which is likelihood that the product's design would cause plaintiff damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, on the utility of the product. Now, they had the single-piece wheel sitting on their shelves, so there's no burden on it. But I'm accepting the risk-utility test is an incredibly factually intensive thing for a jury to decide. So I think the most appropriate thing to do would be to take away these issues the jury shouldn't have been deciding and just go back and decide that issue. And understanding, you know, all of the evidence that came in on the dangers of this product and what they knew, it's very — the drug screen that came in was especially concerning to us. We felt it put a mountain in front of us that we couldn't get over, that the jury was making a moral judgment on our clients about whether they were worthy of getting a judgment instead of focusing on the right evidence. I didn't get a chance to talk to any of the jurors. Obviously, I can't improperly probe the jurors' minds. But setting aside that it's prejudicial, there was no foundation for it. Now, this is not something that the Fifth Circuit doesn't have a case on it directly. Nor is there a district in the Fifth Circuit that does. But there are other districts that have said if you want toxicological evidence to come in about a drug screen, you need a toxicologist to establish it. And there was no toxicologist to say what this drug screen means. There were admissions by the doctor who did it who actually never even treated the plaintiff in this case. He sought treatment from him. The drug screen came back. He didn't treat the plaintiff. The fact that it's in a treating doctor's records doesn't mean it's relevant to an issue the jury is to decide. No toxicologist testified that this couldn't have been a false positive. The doctor admitted it could pseudofed, like common foods can result in showing a positive for meth. But more importantly, it wasn't relevant to any of the damages issues at all that the jury was deciding. It wasn't relevant to whether he was damaged or the extent to which he was damaged. There was zero medical causation evidence that if he had done an illegal substance, that, more likely than not, within a reasonable degree of medical certainty, was causing his symptoms. Nobody said meth, more likely than not, or at any point, could be causing these symptoms, Judge. So we don't think it should have come in. It was irrelevant, prejudicial, no foundation. Kagan. Exactly on time. Well done. All right. Ms. Rabelais. I'm sure I butchered your name so you can correct me. I'm sure I butchered your name so you can correct me. Oh, no, ma'am. Not at all. May it please the Court. My name is Joy Rabelais. I represent Titan International. You said it just fine. Thank you. A couple of issues on the reasonably anticipated use. Perceivability and reasonably anticipated use, Your Honor. I believe, Judge Haynes, that you're absolutely correct. They're not the same thing. This Court has been clear that just because there's a foreseeable use or misuse of a certain product does not mean that it is inherently, in and of itself, unreasonably dangerous. Are you saying the corporate representative also admitted reasonably anticipated use? And if you look at page 8 of the Court's memorandum order on the motion for JMOV, she covered that very well, Your Honor. She says she covers that question and answer session with was it foreseeable? Was it reasonably anticipated? And what she ruled was plaintiff's counsel plainly defined reasonably anticipated as foreseeable. But this is not an appropriate standard. It might be foreseeable to a manufacturer that someone would use its product in a particular way, but that does not necessitate a finding that the use was reasonably anticipated. And she went on to cite the Matthews v. Remington Orange case about the warnings if you drop the bolt action pin that it could cause a misfiring of the weapon. Can they see that that could happen? Yes. Does it mean that it goes towards the issue of reasonably anticipated use? When we send out, there was testimony that there was a catalog that went along with this. These cars are not sitting on shelves waiting for John Q. Public to go in and buy it. This is a very customized wheel. It is a customer in forming, in mining, military. It is a customer who needs a certain wheel for a certain type of vehicle that that customer is manufacturing, and they want this wheel and tire to go with it. Is the utility any different of a multi-piece versus a single piece? I mean, might there be a reason you would pick the multi-piece over the single piece as a? Yes, Your Honor. There is, because the single piece, number one, there are certain sizes that once you get to these larger sizes, you cannot use a single piece ram because you cannot bend the rubber enough to get it over. They call it buttonholing whenever you use a single piece ram. You can't get that rubber to flex enough because these tires are so substantial. That is one place. Secondly, a lot of times, say like with forming, they need to be able to deal with a flat tire in the field or deal with it on base. And with a multi-part ram, they can do that. With minimal tools, they can do that. But when you start getting into your larger size tires, you need a $40,000 piece of equipment to be able to disassemble and reassemble a single piece tire. Don't you need this cage for the multi-piece? They're recommended actually for both. When you look at the warnings and recommendations that are out there, you're told not to stand in front of it. You're told to put it in a cage. You are told to use a clip-on chuck so that you can stand away from the trajectory area. None of those precautions were followed. But they're saying the single piece couldn't blow up like this. Whatever wrong, right, whatever with the single piece couldn't have caused the injury that a bear suffered here. I think where the disconnect is coming in in the argument, Your Honor, is anything that is under pressure has a chance of blowing up. Whether it is a single piece tire and ram assembly or a multi-piece. The reason that there may be an explosion is different. One may be for not putting the locking ring on the multi-piece and bead failure may be the reason for the single piece. But it doesn't eliminate the risk to the point of that an explosion can occur because both of them are pressurized vessels. So when they're not handled by appropriately trained persons, there is the same risk of death or great bodily injury due to the vessel releasing air quickly or exploding, for lack of a better term. With regards to the NHTSA documentation, that was regarding on-highway use applications of these tires. Dave Poole testified that he's been with the company since its predecessor, Firestone. He was aware of four accidents involving Titan's multi-piece ram since the mid-1970s. He also testified that Titan manufactures approximately 30,000 of multi-part rams every year. Do the math. The chance for the injury over that period of time, with four known to Mr. Poole, is not high. I understand. How many single-piece ram accidents did he know about? He was not asked that question, Your Honor. But they do happen. And Dr. Huerta, plaintiff's like- Is that supposed to be a mystery for the rest of my life? I just will never know. Dr. Huerta did admit that, you know, trained professionals should service either one of these tires. That's why the warnings that are put out even by OSHA are the same. No matter which wheel unit you're dealing with, the warnings remain the same. I think, too, that plaintiff's argument goes a little bit too far into the area of, well, this accident happened, so this product must have been unreasonably dangerous. And I don't think that that's the way this analysis works. A manufacturer under Louisiana law is allowed to expect that people will heed the warnings. The evidence in this case showed that there was no safety cage, there was no chains, there was no clip-on chuck that could be put on so that Mr. Abare could step out of the wheel's trajectory. His boss said, I don't allow that because people forget about it and end up thinking putting too much air in the tire and it causes an accident. So I think the long and the short of it, a lot of this was really a workers' compensation claim issue, lack of training. And we had all this evidence that did go to the jury on the lack of training, the lack of providing appropriate safety measures for Mr. Abare to use. With regard to the alternate design, Your Honors, Dr. Huerta did say that single-piece wheels can fail and could cause injury. The cause of the accident is not the standard, the safe alternative. It's just whether the alternative design is capable of preventing the plaintiff's injuries. Both can cause harm, you know, and I had said in closing at the trial of this matter that, you know, we often hear reinvent the wheel. Well, here we really have to reinvent the wheel so that perhaps the tire doesn't require air because every tire, the tire on your bicycle, the tire on your car, the tire on your bike, the tire on these pieces of specialized equipment for which my client is hired and the customer requests this multiport rims for their purposes, for service in the field, for ease of changing out parts, for a multitude of reasons, they all, all of them, the common denominator is that they're a pressurized vessel. So until... That's a good excuse for not changing my own black tire. I believe so, Your Honor, or don't kneel in front of it, absolutely. What about the drug issue? The drug issue, Your Honor, that was the subject of a motion in limine. It was the subject of much debate before and during trial. I believe that Judge Foote, you know, her evidentiary ruling is entitled to great deference on this issue. She said, you know, just because it was a bad fact for the plaintiffs doesn't make it excludable. It was relevant, Your Honor, to mitigation of damages, to compliance with treatment. It went towards a lot of the treatment that was going on and whether things were lingering where they shouldn't have. It went to a lot of those things. It was brought up in opening statement by plaintiff's counsel, perhaps as a tactic to try to deflate what it was. It also went to impeachment and credibility. There were notes like Dr. Henderson had testified by deposition and in his records that were admitted into evidence that Mr. Hebert stopped treating with Dr. Boesel because he didn't like the way the drugs made him feel. Well, Dr. Boesel's records and his testimony showed he never prescribed those medications. So it did go towards credibility of the witness at that point as well as credibility of Ms. Hebert. Whether you comply with your doctor's instructions, whether you take your medications accordingly, whether you overuse or underuse medications and that causes certain things, those things are relevant to the extent of a person's disability. Okay. Anything else you'd like to share with us? No, ma'am, Your Honor. I believe that, Your Honor, Judge Graves was correct. There were a lot of issues. The jury heard practically everything that they could have heard from both sides and it was a matter of their choice. And the first two questions on the jury verdict form were, was it unreasonably dangerous in design? And they said no. Was it unreasonably dangerous because of lack of warning? They said no. And I think that a misuse of the product here in any way could have allowed the jury to say no to both. Because, just because Titan could foresee that someone may not put a lock ring in or someone may overinflate a tar doesn't equate to a finding of liability under the LPLA. Thank you. Thank you. Okay. I'm still not hearing an articulate reason why admitting a single methamphetamine positive drug screen from 10 or 11 months after the incident that happened with a doctor who didn't ultimately treat the plaintiff is relevant to anything the jury had to decide. The fact is, he did a drug screen. In the current opioid environment we live in, doctors should do them and they should be very careful about prescribing opioids so that they don't get in trouble. And if there's any reason to give them pause now to do it, they're not going to prescribe them. Dr. Boesel saw the plaintiff one time. He did a drug screen. He made no judgments about what it meant or whether my client was some kind of bad person or did meth. He simply said, if there's a positive, I don't treat. That has nothing to do with the extent of the plaintiff's damages whatsoever. And it had no medical causative relationship to any of his symptoms from those injuries. There was no relevance other than to paint the plaintiff in a negative light. And when you look at what ultimately didn't happen, but they had another expert who talked about trying to say the plaintiff did eight or nine other drugs in their history, those all ended up being excluded. But the point is, I think it sheds light on why they wanted to do it. They know a jury is less likely to give money to a person that they think does an illegal drug. And I can understand that. But it had no relevance to anything. And if there were admissions, it could be a false positive. And it's incredibly prejudicial. And you need a toxicologist. And Dr. Boesel, even though he was not disclosed as — You're saying that doctors cannot read reports they get back? They send in my blood sample to see if I have the flu. They can't read that report and go, you don't have the flu? I mean, then what's the point of going through all these tests? No. I'm not saying a doctor can't do that. I'm just saying it had no relevance to the issues in this case. Dr. Boesel was entitled to make the decision he made. You're saying he couldn't review the toxicology report and speak about it. And I'm saying, why not? That's what doctors do this all the time. Well, he — Why do you get these results when you go to the doctor? And he can rely on them. But he admitted, I'm not a toxicologist. I can't draw toxicological conclusions about it. And yet he was able to say, because it was sent back in for conclusory, a second test, the same sample, that means I don't think it was a false positive. That's a toxicology opinion. It's not one he gave in his depot. It was brand new. It was objected to. It was never disclosed. And he could — did not have the foundation to give that opinion under 702. With regards to Titan saying we only know four incidents, document 208, page 175 — this is, again, Clayton — Titan's corporate rep, Mr. Kuhl, lines 12 through 15. Quote, in any event, Mr. Kuhl, Titan has been aware for decades that hundreds of people have been killed from the explosive separation of multi-piece wheels. True? Answer, yes. They can't stand here and say they know of four when their corporate rep admitted they've been aware for decades of hundreds. There's government investigations of 400 to 500 documented incidents. With respect to reasonably anticipated use and conflating it with foreseeability, after saying it can be inflated without the lock ring, yes, that's foreseeable. It can be inflated with the lock ring not fully seated. Yes, it's foreseeable. It's reasonably — page 189, lines 8 through 10 — it's reasonably anticipated by Titan that it can happen. Correct? Answer, yes. They — Was it defined reasonably anticipated as a legal term, or was it just another word for foreseeable? I mean, the fact that a layperson says something is the proximate cause doesn't necessarily mean they're using the legal definition of proximate cause. And so how do we know that the judge's determination that this was just the two were synonymous in the respondent's mind is incorrect? Well, I can only assume that the witness listens to the exact question that I ask and answers the exact question that I ask. Wow. And it's not a legal conclusion. I mean, we have to assume that they're — You live in a different world than I live in as a lawyer. I mean, he didn't come back and say, I didn't understand your question correctly when the other side examined him. I mean, I asked foreseeable and I asked reasonably anticipated different questions, and it's not a legal question. It's a factual question for the jury to decide, and he's there on behalf of a party answering it, making — binding admissions on behalf of a party, and he said it was reasonably anticipated, we've known for decades. This can happen under these circumstances. And so, Your Honors, I would ask the case be set back down without the meth screen coming into evidence because it's irrelevant without foundation, and we retry it just on the element of the risk-utility analysis. Thank you. Okay. Thank you. This case is under submission. We will now take a five-minute break to reconstitute the panel.